## STATE v PORELLO

Ohio Appeals, 8th Dist, Cuyahoga Co.

No. 17869. Decided Oct. 28, 1940.

Frank T. Cullitan, Cleveland; James P. Hart, and John Butler, for plaintiff-appellee.

Wm. E. Minchell, Cleveland; Elmer E. McNulty, Cleveland, and William L. Brooker, Cleveland, for defendant-appellant.

## OPINION

By MORGAN, J.

The defendant, Angelo Porello, was indicted for murder of Joseph Smeraldi on the evening of November 11, 1939. A jury having been waived, the case was heard by three Judges of the Common Pleas Court. The defendant admitted the killing, but claimed that he acted in self-defense. He was found guilty of murder in the first degree without recommendation of mercy and was sentenced to the electric chair.

The defendant and Joseph Smeraldi in 1936 had been partners in operating an illegal still. The defendant had served time for a violation of the liquor laws and upon his release made his home at 2016 Woodland Ave., Cleveland, Ohio, where he operated a small retail store. Smeraldi was arrested and convicted for stealing an automobile and he had been released from the Mansfield Reformatory only a few weeks before he was killed.

On the evening of November 11, 1939, Smeraldi entered the defendant's store. The only other person in the store was the defendant. The prosecution fixed the time of Smeraldi entering defendant's store at 10:45 P. M. while the defendant placed the time a few minutes later. Shortly after entering defendant's store, Smeraldi was killed by the defendant. Immediately after the shooting defendant went across the street to a neighbor's house and either called or had another person call the police.

The only living eye witness to the killing is the defendant. He testified substantially as follows:

On the evening of November 11, 1939, a little before 11:00 P. M., an automobile stopped in front of his home and store at 2016 Woodland Avenue. Smeraldi got out of the car and en-. tered the store-room. On entering, Smeraldi said to the defendant, "I be waiting for you I find you alone." Also, "I want you two things to do, one thing, don't talking about me, and another thing, pull all money you got in your pocket and hand to me."

The defendant was standing behind the counter and on the counter there was a pair of shears which when closing at night defendant would usually wedge into a staple so as to securely lock the door. Smeraldi grabbed the shears and said to the defendant, "Don't make no move because I will going to put this, I going to stick this in your heart and I make it come out from your back."

Defendant drew $25.00 in five dollar bills out of his pocket which he handed to Smeraldi. Smeraldi said that he wanted the "big bill". Defendant answered, "I got, Mr. Joe, little more change in the side show case. If you want me to get, I get it for you." The defendant then opened the show case where there was an automatic revolver. He picked up the revolver and said to Smeraldi, "This is the big bill".

Smeraldi had "scissors in his hand and another hand he had alone. * * * I was scared that the hand he got alone I don't know what he got and I figure this fellow going to shoot me." The defendant then shot Smeraldi, firing seven shots in all, of which at least three would have been fatal.

When the police arrived Smeraldi was lying on the floor dead, with a pair of scissors in one hand. The five dollar bills were also on the floor. A photograph of Smeraldi lying on the floor, showing the shears in his right hand, was taken by the police and it is one of the exhibits in the case.

The defendant claims that he killed Smeraldi in self defense. He contends that Smeraldi entered the building at 2016 Woodland Avenue for the purpose of committing a robbery, and that the defendant in resisting robbery, believing himself in imminent danger of his life, shot Smeraldi.

The defendant offered evidence that Smeraldi was out of funds; that he had no money on his person when he was killed and that while in prison he had stated to others that the defendant owed him a substantial sum of money from the time they operated a still together and that he intended to get it when he got out of prison.

While the purpose of Smeraldi's visit may well have been to borrow money or to collect a debt from defendant, it is admitted that Smeraldi was wholly unarmed. It is therefore a violent assumption that he entered defendant's store to commit a robbery.

At the time of the killing, defendant was behind a counter and Smeraldi was in front of it. At the hearing counsel for defendant contended that defendant was placed in imminent peril from the shears which Smeraldi had seized. However, an examination of the record discloses that the defendant did not claim at the trial that he believed himself in danger because of the shears. Defendant testified that he "wasn't scared with the scissors. I was scared that the hand he got alone. I don't know what he got and I figure this fellow going to shoot me." As to the shooting, defendant testified that "I thought he pull out a gun and my finger was on the trigger and shoot the rest in the gun."

Defendant did not testify to facts that would have justified him in believing that Smeraldi had a weapon on his person, or that the latter intended to make use of it. It is our opinion that defendant's evidence, if believed, failed to establish that he shot Smeraldi in justifiable self-defense.

There remains the question of the degree of the crime and whether the State maintained the burden of proving defendant guilty beyond a reasonable doubt of murder in the first degree.

It is the State's contention that the greater part of defendant's testimony as to what occurred at the time of the shooting was fictitious. The State claims that Smeraldi did not have the shears in his hand when he was shot but that after the shooting and before calling the police, the defendant placed the shears in Smeraldi's hand in the position shown by the photograph, to bolster a claim that the shooting was in self-defense.

It is the State's contention that the photograph referred to shows that the shears was lying over the top of Smeraldi's right thumb and not under it,

and that Smeraldi's automobile keys were in his hand under the shears; that these facts are inconsistent with defendant's claim that Smeraldi had grasped the shears before he was shot.

It is our opinion that this claim of the prosecution is far-fetched and wholly conjectural. Some change in the position of the shears in Smeraldi's right hand was to be expected when he fell to the floor and his grasp of the shears naturally would have been relaxed at that time. Also, we cannot say from an examination of the photograph that it bears out the State's contention that the shears was placed in Smeraldi's hand after he fell. If defendant placed the shears in Smeraldi's hand is it likely that he would have left the automobile keys in plain sight in the hand before closing Smeraldi's fingers over the shears? A further answer to the State's contention on this point is found in the fact that the defendant did not base his claim of self-defense upon the shears. He testified, as already stated, that "he was not scared of the scissors" but feared that Smeraldi would use a gun. If the defendant had taken such great pains after the killing to take the shears from the counter and place them in Smeraldi's hand to prove self-defense he would at least have followed this action by testimony that he shot because of fear of his life from Smeraldi's using the shears. It is also evident that there was very little time for defendant to lay the scene after the killing and before he called the police.

The first member of the police department to reach the scene was Howard Leslie of the Motorcycle Division. He was at E. 22nd & Woodland Avenue at the time of the shooting and on information furnished by a woman he ran across the street to defendant's store. He said that he arrived there "about 10:50 P. M." He found the defendant who had already called the police at the doorway of his store. Smeraldi was lying on the floor inside in the position shown in the photograph.

The prosecution at the trial fixed the time of Smeraldi's entering the storeroom at 10:45 P. M. If Lewis is right in his belief that he reached defendants' store at 10:50 P. M., clearly the defendant would have had little or no time to plan and to set up a claim of self-defense before calling the police. It may well be that officer Lewis reached the scene a few minutes later than he testified but even then the time was very short for the defendant to think of his defense and to manufacture evidence to support it.

Even if defendant's evidence as to what occurred be discredited, and even if some of the State's theories be believed, such casts very little light on the question whether there was proof in this case of the required degree of premeditation to sustain a verdict of murder in the first degree. The defendant was then fifty-six years of age and following a conviction for the crime of manslaughter, it is possible for the State to keep him in prison for the balance of his expected natural life.

Defendant admits that the killing was intentional and whether it was premeditated or was perpetrated in hot blood, the defendant would have been interested in either case almost to the same degree in making and supporting a claim of self-defense.

The circumstantial evidence in this case, therefore, gives very little aid in determining the degree of the crime. There is surprisingly little attempt to introduce any evidence in the record tending to show that the killing of Smeraldi was premeditated. The State stresses the statement that the defendant made to officer Lewis as soon as the latter had arrived on the scene. Lewis testified that defendant told him at that time that as he shot Smeraldi the latter "went" or "turned" to go out. The officer did not testify that he was told that Smeraldi had moved any distance at all toward the door so that the purpose of his turning or moving was clearly only an inference.

This statement was made to officer Lewis by the defendant within a few minutes after the shooting. It is only fair that this statement should be

considered in its entirety. Lewis testified on cross-examination as follows:

"Q. Now, he told you, Porello did, that night that Smeraldi came into the store and demanded money right away, is that right?
A. That is right.
Q. And picked up these scissors and threatened Porello with the scissors, is that right?
A. Yes.
Q. He told you that didn't he?
A. Yes.
Q. Or that he would take his life, is that right?
A. That is what he said.
Q. Angelo Porello then reached in back of him in a show case against the wall, did he tell you that?
A. Yes.
Q. And he handed Smeraldi the money, is that right?
A. That is right.
Q. And as Smeraldi turned to go out—you did have it in here—Porello had an automatic in this same show case which he got and shot Smeraldi, is that right?
A. That is right."

It is thus seen that defendant's statement to officer Lewis as to how Smeraldi came into the store, that he immediately demanded money, picked up the scissors and threatened defendant who thereupon handed Smeraldi money and then shot him, is substantially the same version of what occurred that was testified to by defendant on the witness stand.

As to Smeraldi's "turning" or "moving" at the time of the shooting the defendant at the trial was cross-examined as follows:

"Q. Isn't it true that his body was away from you and he started to leave that store when you fired the first shot?
"A. The first shot, the first or second shot, after I fired the first or second shot, I know he makes some kind of a move; he turned around and I thought he pull out the gun and in the same time I was in the way to

shoot myself and I shot the rest of what I had."

It is thus seen that there is no real inconsistency between what defendant told officer Lewis immediately after the shooting and his evidence at the trial about Smeraldi's "moving" or "turning" when he was shot.

The next evidence to support the claim of premeditated murder is that of William L. Timbers, a Federal Agent. He testified that in January, 1938, or nearly two years before Smeraldi was killed, he had a conversation with defendant. Smeraldi was then in prison for stealing an automobile. Timbers testified that defendant said to him in January, 1938, that during defendant's absence in prison for the violation of the liquor law, "stories had developed as to the action of Mr. Smeraldi with Porello's wife," and that "it was his intention to get even with him upon his return." How he was to get even was not stated. In the meantime, for more than a year the defendant and his wife had been divorced.

This was very tenuous evidence to show that the defendant for two years had harbored the intention of killing Smeraldi "upon his return". At the trial the prosection made no such claim. In his argument to the court the prosecutor did not consider Timber's evidence of sufficient importance even to refer to it. On the contrary, with reference to premeditation, the prosecutor at the trial stated, "I don't say he premeditated it or planned it for a great length of time" thus showing that the prosecutor placed no importance on Timber's evidence.

This evidence, two years old, by a Federal Agent, is also overcome by the fact that Smeraldi and defendant had been in each other's company one week before Nov. 11, 1939. At that time Smeraldi and defendant met at the restaurant of Louis Leonardo, at 2115 Orange Avenue, Cleveland, Ohio. Afterwards, they rode together in Smeraldi's car to defendant's place of business. Defendant made no attempt to "get even" with Smeraldi at that time.

The next fact relied upon by the State to prove "deliberation and premeditation" is found in the evidence of Detective Haas who testified that when he arrived at the scene of the killing the radiator of the car in which Smeraldi came to defendant's store was cold. The State contends that this evidence indicates "that Smeraldi had been in the store and in Porello's company some time prior to the shooting. It did further prove that the defendant's story as to Smeraldi coming in only for a few minutes before the shooting is untrue." It is manifest that whether the radiator of Smeraldi's car when he arrived at defendant's store was hot or cold would depend on the distance travelled by Smeraldi before reaching the store. On the motion for new trial defendant submitted the affidavit of a new witness who testified that Smeraldi was at a barber shop at 2531 Woodland Avenue about 8:30 P. M. and the affidavit of two new witnesses that Smeraldi was seen at a spaghetti house at 2536 Woodland Avenue at 10:30 P. M. on the evening of Nov. 11, 1939.

It was only a few hundred feet from the above locations to defendant's store.

As already stated, the prosecutor at the trial fixed the time of Smeraldi's arrival at defendant's store on the evening of November 11, 1939, at about 10:45 P. M. If, as is now contended by the prosecutor "the appellant's story as to Smeraldi coming in only for a few minutes before the shooting is untrue" because of the evidence that the radiator of Smeraldi's car was cold when the police arrived after the shooting, what is to be said of the prosecutor's statement at the trial that Smeraldi arrived at the store about 10:45 P. M.? If the evidence as to premeditation in this case were not inherently weak, such evidence as the radiator being found cold by the police would not be deemed worthy of mentioning.

Timber's evidence and the fact that the radiator was cold are the two principal pieces of evidence relied upon by the State to prove that this was a premeditated killing.

There is no evidence in the record tending to show that Smeraldi entered defendant's premises on November 11, 1939, because he was lured there or invited there. So far as the evidence goes, Smeraldi went there on that evening solely on his own initiative, and for his own purposes. When the prosecutor at the hearing in this Court was asked for what reason in his opinion did Smeraldi enter defendant's store and home, he answered frankly "he may have gone there to get money". We think from the evidence in this case that this was most likely Smeraldi's purpose and what is more likely than that, a quarrel developed, old animosities were revived and that the killing was in hot blood. Some importance was attached to the fact that seven shots were fired in all. We think it just as likely that a person with a finger on a trigger of an automatic would continue to shoot in the case of a killing in hot blood as in the case of coldly premeditated murder.

We have examined this record carefully, especially in view of the fact that the defendant was found guilty of murder in the first degree without recommendation of mercy by three able Judges of the Common Pleas Court. However, we have a duty to perform which we shall not shirk and that is to be both fair to the State and to this defendant in our consideration of all of the evidence adduced at the trial.

It is the conclusion of this Court that defendant failed in his proof that the killing was in self-defense. The majority of the Court are convinced that there is no evidence in this record which is not consistent, in fact is not more consistent with the conclusion that the killing of Smeraldi followed as a result of a quarrel, probably following a demand for money by Smeraldi, than with the view that this was a case of premeditated murder. No proof was offered, in our opinion, that justified the Court in finding beyond a reasonable doubt that defendant was guilty of murder in the first degree.

It is, therefore, our decision that the record does not show the intent to kill and premeditation requisite for murder in the first degree. The court

therefore has concluded to modify the verdict and judgment by reducing the express finding of murder to the included lesser crime of manslaughter. The verdict and judgment of the Common Pleas Court is set aside and the case is remanded to that Court with instruction to re-sentence the defendant to the Ohio Penitentiary for the period provided by the Statutes of Ohio for the crime of manslaughter.

TERRELL, PJ., concurs.
LIEGHLEY, J., dissents.

LIEGHLEY, J. (Dissenting):

This case was heard and decided by three Judges of the Common Pleas Court. The defendant was indicted and charged with the crime of murder in the first degree. Upon trial, the defendant interposed the defense of self-defense.

The issues were clear-cut. The State claimed that the defendant was guilty as charged. The defendant admits the killing and claimed that he did so in the exercise of his right of self-defense. In my opinion there is no middle ground upon the proof presented to the trial court. The defendant is either guilty of murder in the first degree, or he is not guilty by reason of his affirmative defense.

The credibility of the witnesses is to be determined by the trial court. With such determination, except in rare instances, we have nothing to do. There is wisdom in this rule. The trial judges saw the witnesses, heard them testify, observed their demeanor, and doubtless considered all other elements that by law may be considered in determining their credibility and were in an immensely better position to arrive at a conclusion as to the truth of the entire situation and the true situation as established by all the proof.

The defendant undertook to sustain his affirmative defense of self-defense by his testimony alone. He told a story in support thereof that is rebutted by almost every material circumstance developed otherwise in the proof. The trial judges by their verdict reached the conclusion that the defendant had wholly failed in his efforts to establish his defense. The story told by him is so improbable and incredulous that it cannot be believed by any disinterested individual. That an acquaintance for years would park his car in front of his store, alight and enter unarmed and undisguised, to rob in the manner described by the defendant is as ridiculous as is a claim that a sieve will hold water. With the conclusion of the trial court on this issue I am in complete accord.

This issue having been concluded adverse to the defendant, we are remitted to an examination of the proof offered in support of the charge in the indictment.

The defendant admitted the killing. Having failed to sustain his defense, the killing was purposely and unlawfully done. Under the proof it was purposely and maliciously done. He told the officer a few minutes after he did the shooting that he shot the deceased as he was leaving. He shot him maliciously because of the grudge he harbored in his mind for several years engendered by his own valuation placed on the relations said to have existed between his wife and deceased. This is second degree murder. §12403 GC.

Was there evidence of premeditation and deliberation? The Federal Agent working in the United States Internal Revenue Service testified in the case that he had a conversation with the defendant in January, 1938. This interview was probably occasioned by the activity of the defendant in some unlawful liquor traffic. The defendant threatened Smeraldi at that time that when the deceased came out of prison he would take care of him and get even with him. The defendant evidenced a grudge at that time by reason of some allegedly illicit relationship between the defendant's wife and Smeraldi during the time the defendant was incarcerated. The record shows that this unfriendly feeling had existed for some time and it continued up to the time of the killing. As evi-

dence of its existence at that time the defendant in explaining the happenings at the time of the murder carried this grudge into the first declaration which he said Smeraldi made when he entered his store on the night of November 11, 1939, by claiming that Smeraldi said there were two things he wanted. One was that he wanted the defendant to stop talking about his wife and Smeraldi, and the other was that he wanted money.

The facts and circumstances developed by the proof justify the likely conclusion of the trial court that this was a premeditated deliberate murder, and that the defendant had prepared and planned the situation in detail in that store in readiness for Smeraldi when and if he entered the store and that upon completion of the slaughter the defendant faked the appearance of a robbery to cover up. The record clearly sustains such a conclusion on the part of the trial court and with such conclusion I am in full accord.

The defendant and Smeraldi had been acquainted for years. It is said they were together in unlawful liquor traffic. Both had served time. It appears that when the defendant was in jail, Smeraldi was out and the defendant, whether true or untrue, believed that improper relations took place in his absence between his wife and Smeraldi. That his feelings in this respect engendered malice toward Smeraldi is evident from the proof.

Smeraldi entered the defendant's store that night unarmed and undisguised. From the only testimony given by the defendant, Smeraldi was in that store about fifteen minutes. The cold engine of his car would indicate that he was there longer. What really took place during all this period will never be known. It is established that when Smeraldi started to leave the store, he was shot down with six or seven bullet holes in his body. The counter was between the two men. The defendant was in no danger with a revolver in his hand without shooting.

In the first interview with Patrolman Lewis, a few minutes after the shooting, the defendant said he grab-

bed the gun and shot Smeraldi as he was about to go out.

There appears no genuine lawful reason of any kind for this killing. After the killing, five $5.00 bills were spread around. The decedent was lying prone upon the floor on his face. Under his hand was found the key to his automobile and the shears were inserted in the same hand. Smeraldi, about to commit a robbery and assault the defendant in doing so by and with the scissors picked up in this store, could not likely hold the key to his automobile in the same hand with the shears. The deceased in starting to go out to his automobile evidently in a casual manner lifted the key from his pocket to start his car when outside. After the shooting the scissors were easily inserted in this hand for appearances.

The maliciousness of this killing is evidenced by the circumstances. The fact that six or seven bullets were fired into this man's body, some of them from the rear, demonstrating the venom in this act of killing, with other circumstances that might be enumerated, may all be considered in support of the charge that the defendant deliberately, and with premeditation, killed Smeraldi.

Many other circumstances might be enumerated not hereinbefore enumerated, to the same end, the recitation of which would serve no useful purpose.

The majority of this court have decided to modify the judgment of the trial court by reducing the degree of the crime committed from murder in the first degree to manslaughter.

I am dissenting from the judgment of the majority of the Court in this case.

One theory upon which such conclusion may be predicated is that the defendant was acting in self-defense, but used too much force in repelling his assailant. No such defense was interposed by the defendant. There was no claim that the shooting was accidental. There is no claim that it was done in the heat of passion during a sudden quarrel. The only claim is that the defendant acted in self-defense in repelling a robber.

The trial court held this claim to be unsustained by proof. This claim being based on falsehood and completely failing, tends to support the charge under the circumstances in this case.

The other theory upon which such reduction might be granted is that there is no proof of premeditation and deliberation or purpose and malice. On the issue of premeditation and deliberation there is the testimony of the Federal Agent, plus the circumstances of a vicious, malicious killing of a human being by shooting him first in the back and then pumping many more bullets into his body and then seeking to cover up by faking a robbery scene. This theory of no evidence repudiates the above evidence as incredible. This is weighing the evidence and reversing on the weight of the evidence by two Judges of this Court.

In my opinion there is room for only one of two conclusions. There is no middle ground. The defendant is guilty of murder in the first degree or he is not guilty of the commission of any crime charged in the indictment.